DANIEL DE FOSSE, Plaintiff-Appellant, v. CHERRY ELECTRICAL PRODUCTS CORPORATION, Defendant-Appellee.

Second District   No. 2—86—0343

Opinion filed June 26, 1987.—Rehearing denied July 28, 1987.

Richard J. Smith, of Sullivan, Smith, Hauser & Noonan, of Waukegan, for appellant.

Julie Badel and John R. Doyle, both of McDermott, Will & Emery, of Chicago, for appellee.

JUSTICE NASH delivered the opinion of the court:

Plaintiff, Daniel DeFosse, appeals from a judgment entered upon a jury verdict returned in favor of the defendant, Cherry Electrical Products Corporation, in a contract action in which plaintiff sought damages for wrongful termination of his employment and disability benefits. Plaintiff's primary contention on appeal is that the jury was improperly instructed.

Plaintiff was employed by the defendant as foreman of its twist screw machine department. He became disabled and began receiving disability benefits on April 5, 1982. On May 7, 1982, defendant terminated plaintiff's employment and his disability pay, whereupon plaintiff filed a complaint in the circuit court against the defendant in which he alleged the existence of an employment contract and defendant's breach thereof.

At trial, it was established that plaintiff suffered from hydrocephalus when he was employed by the defendant in September 1978, at which time he brought his medical condition to defendant's attention and inquired about disability benefits. In discussing these and other employee benefits in detail with the plaintiff, the personnel manager gave plaintiff a "Group Benefit Plan" booklet and a "Welcome to Cherry" booklet. Plaintiff testified that he read the booklets and that

the benefits package was an important factor in his decision to take the job.

The Group Benefit Plan booklet contains a description of disability benefits, and provides that full-time, salaried employees are eligible for disability pay after 90 days' employment provided they submit a physician's statement of disability. Under the short-term disability coverage, an employee is entitled to receive his full salary for a period of time which is based upon his length of employment, the maximum period of short-term benefits being 13 weeks from the time the employee becomes disabled. After 13 weeks, long-term disability coverage goes into effect, and the employee is entitled to receive at least 50% of his salary as long as he remains disabled or for the maximum duration for payment of benefits, which is based upon the employee's age.

The "Welcome to Cherry" booklet sets forth company policies and procedures, including a "Resolution of Disagreement" procedure which provides:

"Even with the best intent there occasionally develop disagreements between an employee and his supervisor. In the event this occurs, the following steps have been developed to resolve the disagreement.

1. Discuss your situation with your supervisor.

2. If you cannot resolve your situation request permission to see a member of Personnel. Your supervisor is obligated to grant permission.

3. See a Personnel representative to:

(a) Investigate the situation

(b) Resolve the situation between you and your supervisor, if possible, or go to the next step.

(c) If the Personnel representative is unable to resolve the situation, he/she will then meet with your department manager in an effort to resolve the problem.

4. If the situation is still not resolved, the Vice President of Personnel will meet with another company officer and attempt to resolve the situation.

5. Finally, if the situation is still not resolved, the Vice President of Personnel, another company officer and the President will meet to resolve the situation.

6. If you desire, you may be involved in any part of the procedures above."

Peter Cherry, company president, testified that disability pay is a fringe benefit offered to employees, and that plaintiff was given the

"Group Benefit Plan" booklet and the "Welcome to Cherry" booklet when he was hired. Cherry stated that plaintiff and the company had an oral employment agreement whereby plaintiff agreed to perform the duties of screw machine leader and the company agreed to pay him $7.14 per hour and fringe benefits as described in the employee handbooks. Plaintiff was eventually promoted to foreman, and was considered to be a salaried employee.

In January 1982, two employees in the screw machine department became ill and were hospitalized, and their absence required plaintiff to assume the operation and repair of the machines, in addition to performing his supervisory duties. Upon doing so, plaintiff developed chest pain, and, believing it was caused by exposure to the oil in the screw machines, he left work on March 29, 1982, and did not return. On April 12, 1982, plaintiff saw Dr. John Curns, a psychiatrist, who diagnosed plaintiff as suffering from anxiety, and recommended that he not return to work. Upon Dr. Curns' certification, plaintiff was placed on disability by defendant and disability payments were made to him commencing April 5, 1982. While he was on disability, plaintiff performed some volunteer work for the Omega Agency, an advertising agency which assisted the hard-core unemployed. Upon learning of plaintiff's activities, defendant's employment manager sent a letter to plaintiff on May 7, 1982, informing him that he was discharged for receiving disability pay while having other employment. At the same time, defendant also terminated plaintiff's disability pay.

Donald Straka, vice-president of manufacturing, testified that he had been instructed by the personnel manager to draw up plaintiff's termination papers, and that he did so without discussing the decision with plaintiff or anyone else.

■ Plaintiff contends that the trial court should have instructed the jury that, as a matter of law, the employee handbooks were enforceable as part of plaintiff's employment contract, and that an employer may not terminate disability benefits upon discharging the employee. The record shows that plaintiff did not offer the instructions he now contends should have been given, and since a party may not raise on appeal the failure to give an instruction unless he shall have tendered it, he waived the issue for purposes of appeal (87 Ill. 2d R. 366(b)(2)(i); *Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d. 409, 414, 458 N.E.2d 530.)

■ Plaintiff also contends that the trial court erred in refusing to give the jury an instruction defining total disability; however, the extent to which plaintiff was disabled was not in issue at trial. No instruction need be presented to the jury concerning an issue not raised

by the pleadings or proof. *Seward v. Griffin* (1983), 116 Ill. App. 3d 749, 755, 452 N.E.2d 558.

In any event, the instructions given by the court were proper in that they required the jury to determine whether the employee handbooks created any enforceable contract rights; however, it is apparent from the record that the jury's verdict in favor of the defendant is contrary to the manifest weight of the evidence, and therefore on this ground the judgment will be reversed and the cause remanded for a new trial.

■ Generally, a court of review will not set aside a jury's verdict unless it is against the manifest weight of the evidence. (*Lynch v. Board of Education* (1980), 82 Ill. 2d 415, 423, 412 N.E.2d 447; *Ford v. City of Chicago* (1958), 132 Ill. App. 3d 408, 412, 476 N.E.2d 1232; *Peterson v. Henning* (1983), 116 Ill. App. 3d 305, 309-10, 452 N.E.2d 135, *appeal denied* (1983), 96 Ill. 2d 550.) A verdict is against the manifest weight of the evidence when an opposite conclusion is clearly apparent or when the finding of the jury appears arbitrary and unsubstantiated by the evidence. *Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 671, 475 N.E.2d 1383; *Gabrenas v. R. D. Werner Co.* (1983), 116 Ill. App. 3d 276, 285, 451 N.E.2d 1307.

■ ■ Under Illinois law, a written or oral employment contract which does not specify the term of employment creates an employment relationship which endures at the will of the parties and which is terminable by the employer or the employee at any time, or without cause, subject only to independent contract or statutory provisions. (*Sargent v. Illinois Institute of Technology* (1979), 78 Ill. App. 3d 117, 121, 397 N.E.2d 443, *appeal denied* (1980), 79 Ill. 2d 629.) *In Duldulao v. St. Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, 505 N.E.2d 314, the Illinois Supreme Court held that an employee handbook or other policy statement creates enforceable contract rights if the traditional requirements for contract formation are present. First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed. 115 Ill. 2d 482, 490, 505 N.E.2d 314.

■ Plaintiff contends that the grievance procedure set forth in the "Welcome to Cherry" booklet constituted an enforceable contract

right, and he interprets the provision as requiring notice prior to termination. However, the provision merely allows an employee to discuss a problem with his supervisor or a personnel officer; it does not mandate that the employer initiate the grievance procedure, or notify the employee prior to taking disciplinary action. We conclude that the contract right which plaintiff asserts under the grievance provision of the "Welcome to Cherry" booklet did not exist.

■ As to the disability benefits, it is clear that the disability program was in effect when plaintiff was hired and remained in effect throughout his employment, and it appears that the disability benefits were extended to plaintiff in order to induce him to take the job. According to the testimony of the company president, plaintiff's employment contract included the benefits set forth in the employee handbooks. Applying the principles set forth in *Duldulao* to the present case, it is apparent that the "Group Benefit Plan" booklet created enforceable contract rights to the disability benefits described therein.

Given the existence of a contract to pay disability benefits, the next question is whether defendant breached the contract when it terminated plaintiff's disability pay. Defendant contends that the discharge of an employee at will terminates the employee's right to receive disability benefits. Defendant offers no authority, and we are aware of none, supporting the proposition that an employer may arbitrarily terminate continuation of payment of contractual disability benefits to an employee who is discharged while he is on disability.

The "Group Benefit Plan" booklet provides that a full-time, salaried employee is entitled to be placed on disability upon completion of 90 days' employment and submission of a physician's statement of disability. It is undisputed that plaintiff met these requirements and received disability pay for approximately one month. Based upon the length of his employment, plaintiff was entitled to receive short-term disability pay for the maximum period of 13 weeks coverage, at which time he would have been entitled to long-term disability coverage. Although an individual must be a full-time employee in order to be placed on disability, nothing in the plan provides that discharge from employment automatically terminates the employee's right to continue to receive disability pay.

■ The only other provision governing the termination of disability pay is the clause which reads: "The Company reserves the right to discontinue individual compensation under the Sickness and Guaranteed Income Program when the Program is misused or individual claims are excessive." In the present case, defendant did not invoke these reasons for terminating plaintiff's employment or his disability

benefits, nor did defendant determine that plaintiff was no longer disabled. A disability program would be meaningless in the case of employments at will if the employer were permitted to arbitrarily terminate benefits by discharging the employee who is already on disability. Under the provisions of plaintiff's employment contract, he was entitled to continue to receive disability pay even though he had been discharged from his employment, and the jury's determination to the contrary was against the manifest weight of the evidence. Accordingly, the judgment entered in favor of the defendant is reversed, and the cause remanded for a new trial.

Reversed and remanded.

REINHARD and UNVERZAGT, JJ., concur.